ORAL ARGUMENT NOT SCHEDULED
No. 23-5173

---

**In the United States Court of Appeals for the District of Columbia Circuit**

_____

America First Legal Foundation,
*Plaintiff-Appellant,*
v.

United States Department of Agriculture, et al.,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the District of Columbia, Case No. 22-cv-3029
The Hon. Beryl A. Howell, U.S. District Court Judge

_____

**BRIEF OF PLAINTIFF-APPELLANT
AMERICA FIRST LEGAL FOUNDATION**

_____

Reed D. Rubinstein (D.C. Bar No. 400153)
James K. Rogers (AZ Bar No. 027287)
Michael Ding (D.C. Bar No. 1027252)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
(202) 964-3721
reed.rubinstein@aflegal.org
james.rogers@aflegal.org
michael.ding@aflegal.org

*Counsel for Plaintiff-Appellant America First Legal Foundation*

# RULE 26.1 NONGOVERNMENTAL CORPORATION DISCLOSURE STATEMENT

America First Legal Foundation is a 501(c)(3) organization working to promote the rule of law in the United States, prevent executive overreach, and ensure due process and equal protection for all Americans, all to promote public knowledge and understanding of the law and individual rights guaranteed under the Constitution and laws of the United States. To that end, we file Freedom of Information Act requests on issues of pressing public concern, then disseminate the information we obtain, making documents broadly available to the public, scholars, and the media. Using our editorial skills to turn raw materials into distinct work, we distribute that work to a national audience through traditional and social media platforms. America First Legal Foundation does not have a parent corporation, and no publicly held company has a 10 percent or greater ownership interest.

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

A.  Parties

The Plaintiff-Appellant is America First Legal Foundation.

The Defendants-Appellees are:

- United States Department of Agriculture;

- United States Department of Education;

- United States Department of Energy;

- United States Environmental Protection Agency;

- United States Department of Health and Human Services;

- United States Department of Homeland Security;

- United States Department of the Interior;

- United States Department of Labor;

- United States Small Business Administration;

- United States Department of State;

- United States Department of Transportation;

- United States Department of the Treasury;

- United States Department of Veterans Affairs; and

- United States Department of Housing and Urban Development.

B.    <u>Ruling Under Review</u>

The rulings under review are the district court's order (ECF No. 25) and opinion (ECF No. 26), entered by Judge Beryl A. Howell on July 18, 2023, granting the Defendants' Motion for Summary Judgment. The opinion is unreported and may be found at CV 22-3029 (BAH), 2023 WL 4581313 (D.D.C. July 18, 2023).

C.    <u>Related Cases</u>

This case has not previously been before this Court or any court other than the district court nor are there any related cases. However, a case raising certain issues decided below was recently decided by the United States District Court for the Middle District of Florida (*Found. for Gov't Accountability v. U.S. Dep't of Just.*, No. 22-252, 2023 WL 5510417 (M.D. Fla. Aug. 25, 2023)).

# TABLE OF CONTENTS

RULE 26.1 NONGOVERNMENTAL CORPORATION DISCLOSURE STATEMENT ...................................................................................... i

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES .......................................................................... ii

TABLE OF CONTENTS ........................................................................ iv

TABLE OF AUTHORITIES ................................................................... vi

GLOSSARY OF ABBREVIATIONS ....................................................... x

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF ISSUES FOR REVIEW ............................................. 2

STATUTES AND REGULATIONS ....................................................... 2

STATEMENT OF THE CASE .............................................................. 3

SUMMARY OF ARGUMENT .............................................................. 7

ARGUMENT ....................................................................................... 8

   I.   The standard of review. ............................................................. 8

   II.  The presidential communications privilege. ............................. 10

   III.   The district court improperly construed the executive order ...... 11

     A.  The plain text of the executive order demonstrates that the strategic plans called for in section 3(b) were not intended for presidential decisionmaking and deliberations. ................................. 12

     B.  The district court erroneously deferred to Special Counsel Sauber's declaration. ......................................................................... 18

     C.  The evidence contradicts Special Counsel Sauber's contention that the strategic plans were meant for advising the President. ...... 21

*1. The agencies' declarations contradict Special Counsel Sauber's declaration.* ...................................................................... 22

*2. The White House's template contradicts Special Counsel Sauber's declaration.* ............................................................. 23

*3. The White House's fact sheet contradicts the Special Counsel's declaration.* .................................................................... 25

CONCLUSION .................................................................... 30

CERTIFICATE OF COMPLIANCE ...................................... 31

CERTIFICATE OF SERVICE .............................................. 32

ADDENDUM

Exec. Order No. 14,019, 86 Fed. Reg. 13623 (Mar. 10, 2021)... Add. 1

# TABLE OF AUTHORITIES

## EXECUTIVE ORDERS

* Exec. Order No. 14,019, 86 Fed. Reg. 13623 (Mar. 10, 2021).... 3, 13, 14

## CASES

* *Aguiar v. Drug Enforcement Administration,*
    865 F.3d 730 (D.C. Cir. 2017)......................................................21, 22

*Al-Fayed v. C.I.A.,*
    254 F.3d 300 (D.C. Cir. 2001)..............................................................9

*Am. C. L. Union v. U.S. Dep't of Def.,*
    628 F.3d 612 (D.C. Cir. 2011)..............................................................9

*Am. C.L. Union v. Dep't of Just.,*
    655 F.3d 1 (D.C. Cir. 2011)..................................................................8

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)...............................................................................9

*Auer v. Robbins,*
    519 U.S. 452 (1997).............................................................................18

*Bassidji v. Goe,*
    413 F.3d 928 (9th Cir. 2005) .............................................................12

*BedRoc Ltd., LLC v. United States,*
    541 U.S. 176 (2004).............................................................................15

*Cannon v. D.C.,*
    717 F.3d 200, 205 (D.C. Cir. 2013)...................................................25

*Authorities upon which we chiefly rely are marked with asterisks.

*Covad Commc'ns Co. v. Bell Atl. Corp.,*
    407 F.3d 1220 (D.C. Cir. 2005)...........................................................24

\* *Ctr. For Effective Gov't v. U.S. Dep't of State,*
    7 F. Supp. 3d 16 (D.D.C. 2013)...................................................10, 29

*Ebert v. Poston,*
    266 U.S. 548 (1925)............................................................................17

*Ex parte Endo,*
    323 U.S. 283 (1944)............................................................................12

\* *Found. for Gov't Accountability v. U.S. Dep't of Just.,*
2023 WL 5510417 (M.D. Fla. Aug. 25, 2023) ...........................iii, 6, 7, 29

\* *In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997)...............................................10, 11, 29

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018)..........................................................................16

*Jud. Watch, Inc. v. Dep't of Just.,*
    365 F.3d 1108 (D.C. Cir. 2004)..........................................................30

*Jud. Watch, Inc. v. U.S. Secret Serv.,*
    726 F.3d 208 (D.C. Cir 2013).........................................................8, 12

*King v. Burwell,*
    576 U.S. 473 (2015)....................................................................12, 15

\* *Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019)..........................................11, 12, 18, 19, 20

*Larson v. Dep't of State,*
    565 F.3d 857 (D.C. Cir. 2009)..............................................................9

*Loving v. Dep't of Def.,*
    550 F.3d 32 (D.C. Cir. 2008)..................................................11, 16, 30

*New York Times Co. v. Off. of Mgmt. & Budget*,
    531 F. Supp. 3d 118 (D.D.C. 2021)...............................................22, 23

*Pharm Rsch. & Manufacturers of Am. v. United States Dep't of Health
   & Hum. Servs.*,
    43 F. Supp. 3d 28 (D.D.C. 2014).........................................................25

*Protect Democracy Project, Inc. v. Nat'l Sec. Agency*,
    10 F.4th 879 (D.C. Cir. 2021) ..............................................................29

*Pub. Invs. Arb. Bar Ass'n v. S.E.C.*,
    771 F.3d 1 (D.C. Cir. 2014)...........................................................8, 12

*Shapiro v. United States Dep't of Just.*,
    893 F.3d 796 (D.C. Cir. 2018)..............................................................8

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)...............................................................................16

*United States v. Hassanzadeh*,
    271 F.3d 574 (4th Cir. 2001) ..............................................................12

*United States v. Nixon*,
    418 U.S. 683 (1974)............................................................................10

## FEDERAL STATUTES

5 U.S.C. § 552(a)(4)(B).............................................................................1

28 U.S.C. § 1291........................................................................................1

28 U.S.C. § 1331........................................................................................1

## FEDERAL RULES

Federal Rules of Appellate Procedure Rule 28(a)(4)(D) ...........................1

Federal Rules of Appellate Procedure Rule 28(f)......................................2

Federal Rules of Civil Procedure Rule 56(a) ............................................8

**OTHER AUTHORITIES**

\* *FACT SHEET: Biden Administration Promotes Voter Participation with New Agency Steps*, The White House (Sep. 28, 2021), https://tinyurl.com/2zejsch9 ........................................ 4, 25, 26

# GLOSSARY OF ABBREVIATIONS

"AFL" means America First Legal Foundation

"FOIA" means the Freedom of Information Act, 5 U.S.C. § 552 et seq.

# JURISDICTIONAL STATEMENT

A.    <u>The basis for the district court's subject-matter jurisdiction</u>

5 U.S.C. § 552(a)(4)(B) (FOIA) and 28 U.S.C. § 1331 (federal question) are the bases for the district court's subject-matter jurisdiction.

B.    <u>The basis for the court of appeals' jurisdiction</u>

28 U.S.C. § 1291 is the basis for the court of appeal's jurisdiction.

C.    <u>Filing dates</u>

The order and opinion granting the Defendants' Motion for Summary Judgment were entered on July 18, 2023. AFL timely filed its notice of appeal on July 28, 2023.

D.    <u>This appeal is from a final order</u>

The order granting the Defendants' Motion for Summary Judgment is a "final decision of the district court" under 28 U.S.C. § 1291 and a "final order" that "disposes of all parties' claims" under FED. R. APP. P. 28(a)(4)(D).

## STATEMENT OF ISSUES FOR REVIEW

1.      Did the district court erroneously uphold the application of FOIA Exemption 5, presidential communications privilege, to the agency records at issue in this case?

2.      Did the district court erroneously defer to the Special Counsel?

3.      May the presidential communications privilege be applied retroactively to a record reporting final agency actions and agency plans to the White House?

## STATUTES AND REGULATIONS

Pursuant to Fed. R. App. P. 28(f) and D.C. Cir. Rule 28(a)(5), an addendum containing the pertinent executive order is submitted with this brief.

## STATEMENT OF THE CASE

On March 7, 2021, President Biden issued Exec. Order No. 14,019, *Promoting Access to Voting*, 86 Fed. Reg. 13623 (Mar. 10, 2021). Section 3(a) ordered each agency head to "promote voter registration and participation" by, inter alia, considering ways to "provide relevant information … about how to register to vote, how to request a vote-by-mail ballot, and how to cast a ballot in upcoming elections," "facilitate seamless transition from agencies' websites directly to State online voter registration systems or appropriate Federal websites," "provide access to voter registration services and vote-by-mail ballot application forms," and "promote and expand access to multilingual voter registration and election information." *Id.* at 13623–24. Section 3(b) ordered agency heads to submit to the Assistant to the President for Domestic Policy a strategic plan outlining the ways identified to "promote voter registration and voter participation" within 200 days. *Id*. at 13624. ECF No. 1 ¶ 2, Apx.__.

On September 28, 2021, the White House announced that "more than a dozen agencies across the federal government are announcing steps they are taking to respond to the President's call" and—with reference to the strategic plans—highlighted agency "actions to

implement the President's Order." ECF No. 1 ¶ 3, Apx.__ (citing *FACT SHEET: Biden Administration Promotes Voter Participation with New Agency Steps*, THE WHITE HOUSE (Sep. 28, 2021), https://tinyurl.com/2zejsch9). The President's unprecedented effort to deploy federal agencies in support of partisan voting operations and fortify politically aligned private organizations working to circumvent state election integrity laws triggered public outcry and congressional investigations. ECF No. 1 ¶ 4–11, 14, Apx.____, __.

On June 10, 2022, AFL submitted FOIA requests to the fourteen Defendant-Appellees seeking each agency's strategic plan. None complied. On October 6, 2022, AFL separately sued the three agencies that had located the records but withheld them in full (*AFL v. U.S. Dep't of the Treasury, et al.*, No. 1:22-CV-3034-BAH, ECF No. 1 (D.D.C. Oct. 6, 2022)) and the eleven agencies that failed to respond or claimed that no responsive record existed (ECF No. 1, Apx.__). Afterward, counsel for the agencies informed AFL that every agency had searched for and located its strategic plan and claimed Exemption 5. ECF No. 21-16 ¶ 7, Apx.__. Because the two cases then presented the same issues, the district court

granted the parties' joint motion to consolidate them into the present case. ECF No. 19. Apx.__.

The agencies moved for summary judgment before the district court. ECF No. 21, Apx.__. Relying on a declaration by Richard A. Sauber, Special Counsel to the President, ECF No. 21-2, Apx.__ ("Sauber Decl."), every agency claimed the presidential communications privilege. ECF No. 21-1, Apx.__; ECF No. 21-3, Apx.__; ECF No. 21-4, Apx.__; ECF No. 21-5, Apx.__; ECF No. 21-6, Apx.__; ECF No. 21-7, Apx.__; ECF No. 21-8, Apx.__; ECF No. 21-9, Apx.__; ECF No. 21-10, Apx.__; ECF No. 21-11, Apx.__; ECF No. 21-12, Apx.__; ECF No. 21-13, Apx.__; ECF No. 21-14, Apx.__; ECF No. 21-14, Apx.__; ECF No. 21-15, Apx.__.[1]

AFL argued below that section 3 of the executive order did *not* solicit advice or recommendations for presidential decisionmaking. ECF No. 26, Apx.__; ECF No. 33, Apx.__. Rather, it ordered the agencies to

---

[1] Some agencies provided additional justification for withholdings based on Exemption 5's deliberative process privilege. ECF No. 21-1, Apx.__; ECF No. 21-3, Apx.__; ECF No. 21-4, Apx.__; ECF No. 21-5, Apx.__; ECF No. 21-6, Apx.__; ECF No. 21-7, Apx.__; ECF No. 21-8, Apx.__; ECF No. 21-9, Apx.__; ECF No. 21-10, Apx.__; ECF No. 21-11, Apx.__. Because the district court held that the presidential communications privilege applied to the responsive records in full, it did not address the agencies' additional arguments for partial, overlapping withholdings based on the deliberative process privilege. ECF No. 35 at 18 n.1, Apx.__.

implement the President's policy by taking agency actions and considering agency plans.

The district court found that AFL's reading of the executive order "is not an obvious one," and that the executive order "is not plainly 'unambiguous.'" ECF No. 35 at 14, Apx.__. Deferring to Special Counsel Sauber's declaration, the district court held that the presidential communications privilege applies "because the strategic plans were solicited by President Biden through [the executive order] and received by his immediate White House advisors for use in briefing and advising him on voting rights issues." *Id.* at 13, Apx.__. AFL filed notice of appeal on July 28, 2023. ECF No. 36, Apx.__.

Shortly thereafter, the United States District Court for the Middle District of Florida found that "[t]here is a genuine dispute of material fact as to whether the presidential communications privilege applies to the Strategic Plan." *Found. for Gov't Accountability v. U.S. Dep't of Just.*, No. 2:22-CV-252-JLB-KCD, 2023 WL 5510417, at *16–20 (M.D. Fla. Aug. 25, 2023). Because the agency's affidavit lacked sufficient detail regarding the strategic plan's "purported advisory role," and it was contradicted by the record evidence—particularly the text of the executive order—the

6

court could not "find based on the evidence before it that the Strategic Plan constitutes an aspect of presidential decision-making." *Id.* at *19. Accordingly, it ordered *in camera* review to resolve the dispute.

## SUMMARY OF ARGUMENT

The district court erred. First, section 3 of the executive order does not solicit communications for the purpose of formulating advice to the President or recommending further presidential decisionmaking. Therefore, the presidential communications privilege cannot shield the government's plans from public scrutiny.

Second, even if the executive order could plausibly be read to infer that the President solicited the agencies' strategic plans to formulate advice for further presidential decisionmaking, Special Counsel Sauber's declaration is not entitled to any deference. The strategic plans merely communicated *agency* actions and *agency* plans.

The district court erroneously permits an agency to retroactively assert the presidential communications privilege to withhold in full a final agency record of actions and plans, opening a new "secret law" loophole for agencies contrary to the FOIA and far in excess of the narrow presidential interests protected under the privilege. This Court should

find that the agencies failed to sustain their burden for withholding the strategic plans under the presidential communications privilege, hold that no deference should be afforded to an affidavit or declaration's interpretation of an executive order, hold that the presidential communications privilege cannot be invoked retroactively, and then reverse the decision below and remand the case for adjudication consistent with its holding.

## ARGUMENT

### I.    The standard of review.

The court should review the district court's grant of summary judgment *de novo. Am. C.L. Union v. Dep't of Just.*, 655 F.3d 1, 5 (D.C. Cir. 2011); *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir 2013). A court may grant summary judgment only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

In FOIA cases, the agency must sustain its burden of demonstrating that the documents requested are exempt from disclosure. *Shapiro v. United States Dep't of Just.*, 893 F.3d 796, 799 (D.C. Cir. 2018). Because FOIA applies government-wide, this court generally declines to accord *Chevron* deference to agency interpretations of the statute. *Pub.*

8

*Invs. Arb. Bar Ass'n v. S.E.C.*, 771 F.3d 1, 3 (D.C. Cir. 2014) (citing *Al-Fayed v. C.I.A.*, 254 F.3d 300, 307 (D.C. Cir. 2001)).

Typically, the agency proves the applicability of claimed exemptions by affidavit. *Am. C. L. Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). An agency's justification for invoking a FOIA exemption is generally sufficient if it appears "logical" or "plausible," but the affidavit must "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption," and it must not be "controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal quotations omitted). On summary judgment, when there is more than one "reasonable interpretation of [a] declaration," the court "must view it in [the] light … most favorable to … the non-moving party" and "draw 'all justifiable inferences' in favor of the non-movant." *Aguiar v. Drug Enf't Admin.*, 865 F.3d, 730, 734–36 (D.C. Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## II.    The presidential communications privilege.

The presidential communications privilege protects the "President's need for complete candor and objectivity from advisers [and] calls for great deference from the courts." *United States v. Nixon*, 418 U.S. 683, 706 (1974). "The President can invoke the privilege [to shield] materials that reflect presidential decisionmaking and deliberations that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997).

However, the privilege's application "is no broader than necessary to ensure ... the confidentiality of the presidential decision-making process." *Ctr. For Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 24 (D.D.C. 2013). Absent a claim of need to protect military, diplomatic, or sensitive national security secrets, "even the very important interest in confidentiality of Presidential communications is [not] significantly diminished by production of such material for in camera inspection." *Nixon*, 418 U.S. at 706; *see also In re Sealed Case*, 121 F.3d at 752–53 (contrasting the need for confidentiality in cases involving the President in the exercise of his "quintessential and nondelegable" powers with lesser executive powers that "can be exercised or performed without the

10

President's direct involvement"). The privilege "should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *In re Sealed Case*, 121 F.3d at 752.

## III. The district court improperly construed the executive order.

The district court incorrectly concluded that the agency plans and actions at issue in this case are subject to the presidential communications privilege because it improperly construed the executive order.

First, the agency strategic plans submitted under section 3(b) of the executive order were facially not "documents reflecting presidential decisionmaking and deliberations." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008).

Second, even if the executive order may fairly be called ambiguous, Special Counsel Sauber's declaration is not the "'authoritative' or 'official position'" of the President. Rather, it is an "*ad hoc* statement" and "*post hoc* rationalization." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2421 (2019). Special Counsel Sauber's declaration is not entitled to deference because it does not "emanate from those actors, using those vehicles, understood to make

11

authoritative policy in the relevant context." *Id*. Also, Special Counsel Sauber's declaration is "called into question" by the weight of the evidence—the agencies' declarations, the White House's template, and the White House's fact sheet—which confirm that the strategic plans were *not* for presidential decisionmaking and deliberations. *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d at 215.

> **A.    The plain text of the executive order demonstrates that the strategic plans called for in section 3(b) were not intended for presidential decisionmaking and deliberations.**

Courts construe an executive order as they do legislation. *Ex parte Endo*, 323 U.S. 283, 298 (1944). That means reading the text. *Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005) (citing *United States v. Hassanzadeh*, 271 F.3d 574, 580 (4th Cir. 2001)). The words must be read in context and with a view to their place in the overall scheme. *King v. Burwell*, 576 U.S. 473, 485 (2015). Notably, when an executive order applies government-wide, courts should decline to accord deference to an agency's interpretation. C*f. Pub. Invs. Arb. Bar Ass'n*, 771 F.3d at 3 ("because FOIA's terms apply government-wide … we generally decline to accord deference to agency interpretations of the statute, as we would otherwise do under *Chevron*.") (internal quotations omitted).

The district court accepted the agencies' argument that section 3 should be interpreted as authorizing the Assistant to the President for Domestic Policy to provide advice to the President, finding that "section 3 is more reasonably read as tasking agencies to brainstorm and identify ways that they can promote voter registration and voter participation with future possible actions, not merely to report on actions already taken" and that the strategic plans thus contained "information directly relevant for presidential decision-making" and were therefore protected by the presidential communications privilege. ECF No. 35 at 15, Apx.__ (cleaned up). The district court's holding, however, is inconsistent with both the actual text of section 3 and the broader context in which it is found.

Section 3(b) states:

> Within 200 days of the date of this order, the head of each agency shall submit to the Assistant to the President for Domestic Policy a strategic plan outlining the ways identified under this review *that the agency can* promote voter registration and voter participation.

86 Fed. Reg. at 13624 (emphasis added). On its own terms, section 3 is entirely about actions to be taken by each agency, independent of any decisionmaking or deliberation by the President.

13

This construction is reinforced by other executive order provisions. For example, section 6(a) orders the Director of the Office of Personnel Management to:

> [C]oordinate with the heads of executive agencies, as defined in 5 U.S.C. 105, *to provide recommendations to the President, through the Assistant to the President for Domestic Policy*, on strategies to expand the Federal Government's policy of granting employees time off to vote in Federal, State, local, Tribal, and territorial elections. Such recommendations should include efforts to ensure Federal employees have opportunities to participate in early voting.

*Id.* at 13625 (emphasis added). Section 6(b) uses similar language, ordering the Office of Personnel Management Director to:

> Coordinate with the heads of executive agencies, as defined in 5 U.S.C. 105, *to provide recommendations to the President, through the Assistant to the President for Domestic Policy*, on strategies to better support Federal employees who wish to volunteer to serve as non-partisan poll workers or non-partisan observers, particularly during early or extended voting periods.

*Id.* (emphasis added).[2]

When the president wanted agency "recommendations" for his decisionmaking and deliberation, he knew exactly how to ask for it.

---

[2] Similarly, section 10(d) states that the Native American Voting Rights Steering Group "shall study best practices for protecting voting rights of Native Americans and shall produce a report within 1 year of the date of this order outlining *recommendations* for such protection." *Id.* at 13626 (emphasis added).

14

Section 6 specifically requires agencies to coordinate and recommend strategies to the President. On the other hand, section 3(b) provides for no involvement by the President or his advisors at all, other than receiving the list of agency action items. Critically, section 3(b) does not request *any* "recommendations." Nor does it specify that the Assistant to the President for Domestic Policy is to receive the strategic plans for the purpose of providing advice to the President. Instead, section 3(b) states explicitly that the purpose of the strategic plans is "[so] that the agency can promote voter registration and voter participation," which is decidedly *not* the same as section 6(a)'s language commanding agencies to "provide recommendations to the President."

The district court briefly acknowledges the textual differences (ECF No. 35 at 10–11, 14 Apx.____, __), but never actually engages with them or attempts to resolve the interpretative problems created by reading sections 3 and 6 as both asking for the same thing. However, the interpretative "inquiry begins with the ... text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). Just so here. Reading sections 3 and 6's "words in their context and with a view to their place in the overall ... scheme," *King v.*

15

*Burwell*, 576 U.S. 473, 485 (2015), makes it clear that section 3(b) asks for something very different than section 6, and that the agency plans and actions subject thereto were never intended for "presidential decisionmaking and deliberations." *See Loving*, 550 F.3d at 37.

Applicable canons of construction further confirm this conclusion. First, the *expressio unius* canon is that "[t]he expression of one thing implies the exclusion of others." *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018). Thus, section 6's inclusion of the word "recommendations" and section 3's exclusion of this word obviously suggests that the strategic plans prepared under section 3 were not intended to provide recommendations and were not intended for the decisionmaking or deliberation of the President or his close advisors.

Second, it is a 'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted). The district court and the government interpret section 3(b)'s "shall submit to the Assistant to the President for Domestic Policy a strategic plan" as meaning the same thing as section 6's command to

16

"coordinate with the heads of executive agencies ... to provide recommendations to the President" rendering section 6's commands for coordination and recommendations superfluous nullities. But words matter. The only reasonable way to read sections 3(b) and 6 without rendering much of section 6's language as surplusage is to read section 3(b) as *not* requiring agency recommendations to the President or his advisors, and thus not requiring participation in presidential decision-making and deliberations.

Third, "Nothing is to be added to what the text states or reasonably implies (*casus omissus pro omisso habendus est*). That is, a matter not covered is to be treated as not covered." ANTONIN SCALIA AND BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93 (2012). "A casus omissus does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554 (1925). Nor does it permit after-the-fact amendment of an executive order through a declaration by the President's special counsel. Thus, because section 3(b) does not explicitly call for agency recommendations or participation in decisionmaking and deliberation, no such requirement can be read into it after the fact.

**B.    The district court erroneously deferred to Special Counsel Sauber's declaration.**

Even assuming the executive order is ambiguous, the district court erroneously deferred to Special Counsel Sauber's declaration.

To begin with, Special Counsel Sauber's declaration is an ad hoc, post hoc litigation affidavit that is not entitled to any deference. ECF No. 33 at 1, Apx.__.  If, however, there is deference, then it must be *Auer* or *Kisor* deference only. *See Auer v. Robbins*, 519 U.S. 452 (1997); *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). *Auer*/*Kisor* deference is only warranted when there is "genuine ambiguity." *Kisor*, 139 S. Ct. at 2415. Below, AFL argued that such deference is not warranted here. ECF No. 33 at 3–4, Apx.____. The district court fleetingly acknowledged this argument and then rejected it, claiming that "EO 14019 is not plainly 'unambiguous.'" ECF No. 35 at 14, Apx.__.

However, ambiguity is only the first step under *Kisor*. There are four more requirements, and Special Counsel Sauber's declaration fails all of them.

*First*, *Kisor* requires that the "agency's reading must still be 'reasonable.'" *Kisor*, 139 S. Ct. at 2415. The Supreme Court meant for the reasonable test to have real bite, explaining, "let there be no mistake:

18

That is a requirement an agency can fail." *Id*. at 2416. And here the agencies fail, for as described above, the differences between sections 3(b) and 6 make Special Counsel Sauber's reading of the executive order not only unreasonable, but textually untenable.

*Second*, even if Special Counsel Sauber's declaration could pass the reasonableness test, it still fails *Kisor* deference because "the regulatory interpretation must be one actually made by the agency. In other words, it must be the agency's authoritative or official position, rather than any more *ad hoc* statement not reflecting the agency's views." *Id*. at 2416. For an interpretation to be authoritative, it "must at the least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context." *Id*. Special Counsel Sauber states that he is the "Special Counsel to the President, serving in the Office of White House Counsel ... involved in agency Freedom of Information Act ("FOIA") consultations with the White House." Sauber Decl. ¶ 1, Apx.__. He never claims to be an actor who is "understood to make authoritative policy" in the context of executive orders about access to voting, nor is there any other evidence or indicia of Special Counsel Sauber's power to

make authoritative policy in this context. *Kisor*, 139 S. Ct. at 2416, 2421 ("No ad hoc statements or post hoc rationalizations need apply.").

*Third*, *Kisor* deference only applies to an agency interpretation that "implicate[s] its substantive expertise" when the agency has a "comparative expertise in resolving a regulatory ambiguity." *Id*. at 2417. There is no *Kisor* deference when "interpretive issues ... fall more naturally into a judge's bailiwick." *Id*. Special Counsel Sauber offers no special expertise beyond that of a court for interpreting the plain text of the executive order and comparing the language of different sections within.

*Fourth*, *Kisor* requires that an interpretation "must reflect fair and considered judgment to receive ... deference. That means ... that a court should decline to defer to a merely convenient litigating position or post hoc rationalization advanced to defend past agency action against attack." *Id*. at 2417 (cleaned up); *see also Am. C.L. Union v. C.I.A.*, 823, F.3d 655, 664 (D.C. Cir. 2016) (giving no weight to post hoc objections to disclosure). Special Counsel Sauber's declaration merely rationalizes a

political decision to deny AFL and the public an opportunity to see what the government is up to.[3]

## C. The evidence contradicts Special Counsel Sauber's contention that the strategic plans were meant for advising the President.

Because Special Counsel Sauber's declaration is "called into question by contradictory evidence," the district court erred in granting the government summary judgment. *See Aguiar v. Drug Enforcement Administration*, 865 F.3d 730, 735 (D.C. Cir. 2017). The agencies' declarations, the White House's template, and the White House's fact sheet controvert Special Counsel Sauber's contention that the strategic plans were meant for advising the President or for recommending direct Presidential decisionmaking. *Cf. Id.* at 737 ("the record is at once devoid of actual evidence … and replete with inconsisten[cies]."). "Under th[e]se circumstances, with respect to such questions as whether [the strategic plans were] solicited for purposes of the Presidential communications privilege, the statements of declarants … which were contradicted by

---

[3] Indeed, as explained below, the evidence makes clear that, before AFL filed this lawsuit, the strategic plans were understood as being about the agencies' actions and not about providing any recommendations or input to presidential decisionmaking or deliberation.

other evidence in the record, were not sufficient to meet the government's burden of proof." *New York Times Co. v. Off. of Mgmt. & Budget*, 531 F. Supp. 3d 118, 129 (D.D.C. 2021).

> ### 1. *The agencies' declarations contradict Special Counsel Sauber's declaration.*

Special Counsel Sauber declared that the "White House solicited the strategic plans in order to inform *future* policy developments on voting access and to assist the DPC in formulating advice to give to the President in this area." Sauber Decl. ¶ 11, Apx.__ (emphasis added). But the record is "devoid of actual evidence" that this was so. *Aguiar*, 865 F.3d at 737.

Three agencies admitted that their strategic plans consisted entirely of the completed actions that the agencies had already taken in response to the executive order. *See* ECF No. 21-12, Apx.__ (Department of State); ECF No. 21-14, Apx.__ (Department of Energy); ECF No. 21-15, Apx.__ (Environmental Protection Agency). For the agencies that claimed their strategic plans included any future actions, their declarations admitted that only "portions" and "small subset[s]" were deliberative. *See* ECF No. 21-1 ¶ 22, Apx.__; ECF No. 21-3 ¶ 18, Apx.__; ECF No. 21-4 ¶ 14, Apx.__; ECF No. 21-5 ¶ 16, Apx.__; ECF No. 21-6

¶ 12, Apx.__; ECF No. 21-7 ¶ 8, Apx.__; ECF No. 21-8 ¶ 11, Apx.__; ECF No. 21-9 ¶ 13, Apx.__; ECF No. 21-10 ¶ 20, Apx.__. With these contradictions, Special Counsel Sauber's declaration should not be "entitled to deference" and is "not sufficient to meet the government's burden of proof." *New York Times Co*, 531 F. Supp. 3d at 129.

### 2. *The White House's template contradicts Special Counsel Sauber's declaration.*

Special Counsel Sauber admits in his declaration that "[t]o facilitate the discussions and identify priority actions for agency consideration, the White House provided agencies with a template for use in formulating their strategic plans." Sauber Decl. ¶ 8, Apx.__. The district court's opinion found this highly relevant, reasoning that "the White House also provided agencies with a template for developing their strategic plans. Tellingly, the template included disclaimers that '[l]isting an action in this strategic plan does *not* commit your agency to implementing the action' and that 'most agencies will pursue additional actions not listed in this plan.'" ECF No. 35 at 15, Apx.__ (quoting Sauber Decl. ¶ 8) (alteration and emphasis are from the Sauber Declaration).

However, the government never produced the template for the district court below to review its content independently, as it was

23

required to do in *Found. for Gov't Accountability v. U.S. Dep't of Just.*, No. 2:22-CV-252-JLB-KCD, ECF No. 52-3 at 2–4 (M.D. Fla. Nov. 3, 2022), Apx.__.[4] Contrary to Special Counsel Sauber's claims, the template conclusively demonstrates that the strategic plans were strictly for potential agency action, not Presidential decisionmaking.

The first sentence of the template explains that it "is a template for the interim high-level strategic plan ... *describing potential actions each agency is considering to comply with Executive Order 14019.*" *Id.* at 2 (emphasis added). It also explains that more detailed plans, due in September 2021, needed to "confirm statutory and regulatory compliance for each proposed activity (or a short proposal to modify regulations if necessary), an approximate assessment of budgetary impact (if any), and a timeline to implementation concerning access to voting." *Id.* (emphasis added).

---

[4] This court may take "judicial notice of facts on the public record" and "may look to record[s] of another proceeding." *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005). AFL requests that this Court take judicial notice of the interim strategic plan template, which demonstrates that Special Counsel Sauber's interpretation of the executive order is incorrect.

The template then lists eight different categories for agency action, and that for each "category below, there may be multiple discrete opportunities for agency action to implement the Order." *Id.* (emphasis added). This is not the language of a White House seeking agency input with respect to presidential decisionmaking and deliberation, but the language of the White House directing agencies to take action on their own to carry out a predefined policy. Indeed, the words "recommend," "recommendation," "decision," "decisionmaking," "deliberation," and "deliberate" do not appear a single time.

### 3. The White House's fact sheet contradicts the Special Counsel's declaration.

Almost immediately after the agencies submitted their strategic plans to the White House, the White House published a fact sheet highlighting "New Agency Steps." *FACT SHEET: Biden Administration Promotes Voter Participation with New Agency Steps*, THE WHITE HOUSE (Sep. 28, 2021), https://tinyurl.com/2zejsch9.[5] The fact sheet explains

---

[5] Courts in this jurisdiction frequently take judicial notice of public information posted on official government websites. *Pharm Rsch. & Manufacturers of Am. v. United States Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (citing *Cannon v. D.C.*, 717 F.3d 200, 205) (D.C. Cir. 2013)). Accordingly, AFL asks the Court to take judicial notice of the White House's fact sheet.

that "[t]he Executive Order called for each agency to submit to Domestic Policy Advisor Susan Rice a strategic plan outlining the ways that the *agency* can promote nonpartisan voter registration and voter participation." *Id.* (emphasis added). Additionally, these strategic plans "are just the beginning of each agency's *commitments*." *Id.* (emphasis added); *contra* Sauber Decl. § 16, Apx.__ ("there is substantial potential for these propositions to be inaccurately construed by the public as future commitments, past actions, or provisions already in place.").

The White House's fact sheet publicized the "key early actions to implement the President's Order," including:

- The Department of Agriculture's Rural Housing Service will encourage the provision of nonpartisan voter information through its borrowers and guaranteed lenders, who interface with thousands of residents in the process of changing their voting address every year. In addition, Rural Development agencies — which are spread throughout field offices across the country where rural Americans can apply for housing, facilities, or business assistance — will take steps to promote access to voter registration forms and other pertinent nonpartisan election information among their patrons.

- The Department of Education will prepare a tool kit of resources and strategies for increasing civic engagement at the elementary school, secondary school, and higher education level, helping more than 67 million students — and their families — learn about civic opportunities and responsibilities. The Department will also remind educational institutions of their existing obligation and encourage

26

institutions to identify further opportunities to assist eligible students with voter registration.

- The Department of Homeland Security will invite state and local governments and nonpartisan nonprofit organizations to register voters at the end of naturalization ceremonies for the hundreds of thousands of citizens naturalized each year, and will develop a new online resource on voting for recently naturalized citizens. The Department will also provide information and resources for voters impacted by a disaster or emergency event through its training preparedness initiatives.

- The Department of Housing and Urban Development will communicate with public housing authorities (PHAs) — more than 3000 authorities, managing approximately 1.2 million public housing units — through a letter to Executive Directors that provides useful information to PHAs about permissible ways to inform residents of non-partisan voter registration information and services. The Department will also assist relevant HUD-funded service providers by highlighting and sharing promising practices that improve non-partisan voting registration and voting access for people experiencing homelessness.

- The Department of the Interior will disseminate information on registering and voting, including through on-site events, at schools operated by the Bureau of Indian Education and Tribal Colleges and Universities, serving about 30,000 students. The Department will also, where possible, offer Tribal College and University campuses for designation by states as voter registration agencies under the National Voter Registration Act.

- The Department of Labor will issue guidance encouraging states to designate the more than 2,400 American Job Centers, which provide employment, training, and career services to workers in every state, as voter registration

27

agencies under the National Voter Registration Act. The Department of Labor will continue to require Job Corps centers to implement procedures for enrollees to vote, and where local law and leases permit, encourage Job Corps centers to serve as polling precincts. The Department will also provide guidance that grantees can use federal workforce development funding, where consistent with program authority, to conduct nonpartisan voter registration efforts with participants.

- The Department of Transportation will communicate guidance to transit systems — including more than 1,150 rural public transit systems and more than 1,000 urban public transit systems — to consider providing free and reduced fare service on election days and consider placing voter registration materials in high-transit stations. The Department will also work with state and local entities seeking to mitigate traffic and construction impacts on routes to the polls, particularly in underserved communities.

- The Department of the Treasury will include information about registration and voter participation in its direct deposit campaigns for Americans who receive Social Security, Veterans Affairs, and other federal benefit payments.

- The Department of Veterans Affairs will provide materials and assistance in registering and voting for tens of thousands of inpatients and residents, including VA Medical Center inpatients and residents of VA nursing homes and treatment centers for homeless veterans. The Department will also facilitate assistance in registering and voting for homebound veterans and their caregivers through VA's home-based and telehealth teams.

These new actions committed by the agencies in their strategic plans did not concern direct presidential decisionmaking. They were all

28

actions that "can be and [are] 'exercised or performed without the President's direct involvement.'" *Ctr. For Effective Gov't*, 7 F. Supp. 3d at 25 (quoting *In re Sealed Case*, 121 F.3d at 753). None of these actions related to matters where "the importance of the presidential communications privilege, which is 'rooted in constitutional separation of powers principles and the President's unique constitutional role' is at its apex." *Found. for Gov't Accountability*., 2023 WL 5510417, at *16 (citing *In re Sealed Case*, 121 F.3d at 745); *see also Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 887 (D.C. Cir. 2021) ("the President's Article II powers and responsibilities" form "the constitutional basis of the presidential communications privilege." (quoting *In re Sealed Case*, 121 F.3d at 748)).

The evidence weighs heavily against Special Counsel Sauber's claim that the strategic plans "would reveal the information sought and obtained by the White House in the context of presidential decisionmaking." Sauber Decl. ¶ 15, Apx.__. Instead, the evidence demonstrates that the government, by keeping secret the strategic plans, aims to conceal *agency* actions from public view rather than to protect

matters of "Presidential consideration." *Loving*, 550 F. 3d at 40 (quoting *Jud. Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1112 (D.C. Cir. 2004)).

## CONCLUSION

The agencies failed to sustain their burden of demonstrating that the strategic plans are protected by the presidential communications privilege, the district court erroneously deferred to the Special Counsel, and the district court's ruling effectively permits the government to retroactively invoke the privilege to withhold final documents on agency decisions in full. The order below should be reversed, and this case remanded for adjudication consistent with this court's ruling.

Dated:        December 4, 2023

/s/ Michael Ding
Reed D. Rubinstein (D.C. Bar No. 400153)
James K. Rogers (A.Z. Bar No. 027287)
Michael Ding (D.C. Bar No. 1027252)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
(202) 964-3721
reed.rubinstein@aflegal.org
james.rogers@aflegal.org
michael.ding@aflegal.org
*Counsel for America First Legal Foundation*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned counsel certifies compliance with the requirements of Fed. R. App. P. 32. The brief is 5,835 words in length and follows the required font and formatting regulations.

*/s/ Michael Ding*
Reed D. Rubinstein (D.C. Bar No. 400153)
James K. Rogers (AZ Bar No. 027287)
Michael Ding (D.C. Bar No. 1027252)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
(202) 964-3721
reed.rubinstein@aflegal.org
james.rogers@aflegal.org
michael.ding@aflegal.org
*Counsel for America First Legal Foundation*

## CERTIFICATE OF SERVICE

I, Michael Ding, certify that on December 4, 2023, I caused the foregoing document to be filed with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Michael Ding
Reed D. Rubinstein (D.C. Bar No. 400153)
James K. Rogers (AZ Bar No. 027287)
Michael Ding (D.C. Bar No. 1027252)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
(202) 964-3721
reed.rubinstein@aflegal.org
james.rogers@aflegal.org
michael.ding@aflegal.org
Counsel for America First Legal Foundation

# ADDENDUM

<u>**TABLE OF CONTENTS**</u>

<u>**Description of Item**</u>                    <u>**Addendum Page No.**</u>

Exec. Order No. 14,019, 86 Fed. Reg. 13623
(Mar. 10, 2021)                                    Add. 1

Federal Register

Vol. 86, No. 45

Wednesday, March 10, 2021

# Presidential Documents

Title 3—

The President

**Executive Order 14019 of March 7, 2021**

## Promoting Access to Voting

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1**. *Purpose.* The right to vote is the foundation of American democracy. Free and fair elections that reflect the will of the American people must be protected and defended. But many Americans, especially people of color, confront significant obstacles to exercising that fundamental right. These obstacles include difficulties with voter registration, lack of election information, and barriers to access at polling places. For generations, Black voters and other voters of color have faced discriminatory policies and other obstacles that disproportionally affect their communities. These voters remain more likely to face long lines at the polls and are disproportionately burdened by voter identification laws and limited opportunities to vote by mail. Limited access to language assistance remains a barrier for many voters. People with disabilities continue to face barriers to voting and are denied legally required accommodations in exercising their fundamental rights and the ability to vote privately and independently. Members of our military serving overseas, as well as other American citizens living abroad, also face challenges to exercising their fundamental right to vote.

The Constitution and laws of the United States prohibit racial discrimination and protect the right to vote. The Voting Rights Act of 1965 and other Federal statutes implement those protections and assign the Federal Government a key role in remedying disenfranchisement and unequal access to the polls. In passing the National Voter Registration Act of 1993, the Congress found that it is the duty of Federal, State, and local governments to promote the exercise of the fundamental right to vote. Executive departments and agencies (agencies) should partner with State, local, Tribal, and territorial election officials to protect and promote the exercise of the right to vote, eliminate discrimination and other barriers to voting, and expand access to voter registration and accurate election information. It is our duty to ensure that registering to vote and the act of voting be made simple and easy for all those eligible to do so.

**Sec. 2**. *Policy.* It is the policy of my Administration to promote and defend the right to vote for all Americans who are legally entitled to participate in elections. It is the responsibility of the Federal Government to expand access to, and education about, voter registration and election information, and to combat misinformation, in order to enable all eligible Americans to participate in our democracy.

**Sec. 3**. *Expanding Access to Voter Registration and Election Information.* Agencies shall consider ways to expand citizens' opportunities to register to vote and to obtain information about, and participate in, the electoral process.

(a) The head of each agency shall evaluate ways in which the agency can, as appropriate and consistent with applicable law, promote voter registration and voter participation. This effort shall include consideration of:

(i) ways to provide relevant information in the course of activities or services that directly engage with the public—including through agency materials, websites, online forms, social media platforms, and other points of public access—about how to register to vote, how to request a vote-by-mail ballot, and how to cast a ballot in upcoming elections;

(ii) ways to facilitate seamless transition from agencies' websites directly to State online voter registration systems or appropriate Federal websites, such as Vote.gov;

(iii) ways to provide access to voter registration services and vote-by-mail ballot applications in the course of activities or services that directly engage with the public, including:

(A) distributing voter registration and vote-by-mail ballot application forms, and providing access to applicable State online systems for individuals who can take advantage of those systems;

(B) assisting applicants in completing voter registration and vote-by-mail ballot application forms in a manner consistent with all relevant State laws; and

(C) soliciting and facilitating approved, nonpartisan third-party organizations and State officials to provide voter registration services on agency premises;

(iv) ways to promote and expand access to multilingual voter registration and election information, and to promote equal participation in the electoral process for all eligible citizens of all backgrounds; and

(v) whether, consistent with applicable law, any identity documents issued by the agency to members of the public can be issued in a form that satisfies State voter identification laws.

(b) Within 200 days of the date of this order, the head of each agency shall submit to the Assistant to the President for Domestic Policy a strategic plan outlining the ways identified under this review that the agency can promote voter registration and voter participation.

(c) The Administrator of the Office of Electronic Government, Office of Management and Budget, shall, consistent with applicable law, coordinate efforts across agencies to improve or modernize Federal websites and digital services that provide election and voting information to the American people, including ensuring that Federal websites are accessible to individuals with disabilities and people with limited English proficiency. As appropriate, the Administrator of the United States Digital Service may support agencies in implementing the strategic plans directed in subsection (b) of this section.

**Sec. 4**. *Acceptance of Designation Under the National Voter Registration Act.* (a) This order shall supersede section 3 of Executive Order 12926 of September 12, 1994 (Implementation of the National Voter Registration Act of 1993).

(b) Each agency, if requested by a State to be designated as a voter registration agency pursuant to section 7(a)(3)(B)(ii) of the National Voter Registration Act, shall, to the greatest extent practicable and consistent with applicable law, agree to such designation. If an agency declines to consent to such designation, the head of the agency shall submit to the President a written explanation for the decision.

(c) The head of each agency shall evaluate where and how the agency provides services that directly engage with the public and, to the greatest extent practicable, formally notify the States in which the agency provides such services that it would agree to designation as a voter registration agency pursuant to section 7(a)(3)(B)(ii) of the National Voter Registration Act.

**Sec. 5**. *Modernizing Vote.gov.* The General Services Administration (GSA) shall take steps to modernize and improve the user experience of Vote.gov. In determining how to do so, GSA shall coordinate with the Election Assistance Commission and other agencies as appropriate, and seek the input of affected stakeholders, including election administrators, civil rights and disability rights advocates, Tribal Nations, and nonprofit groups that study best practices for using technology to promote civic engagement.

(a) GSA's efforts to modernize and improve Vote.gov shall include:

(i) ensuring that Vote.gov complies, at minimum, with sections 504 and 508 of the Rehabilitation Act of 1973;

(ii) ensuring that Vote.gov is translated into languages spoken by any of the language groups covered under section 203 of the Voting Rights Act anywhere in the United States; and

(iii) implementing relevant provisions of the 21st Century Integrated Digital Experience Act (Public Law 115–336).

(b) Within 200 days of the date of this order, GSA shall submit to the Assistant to the President for Domestic Policy a strategic plan outlining the steps to modernize and improve the user experience of Vote.gov.

**Sec. 6**. *Increasing Opportunities for Employees to Vote*. It is a priority of my Administration to ensure that the Federal Government, as the Nation's largest employer, serves as a model employer by encouraging and facilitating Federal employees' civic participation. Accordingly, the Director of the Office of Personnel Management shall take the following actions within 200 days of the date of this order:

(a) coordinate with the heads of executive agencies, as defined in 5 U.S.C. 105, to provide recommendations to the President, through the Assistant to the President for Domestic Policy, on strategies to expand the Federal Government's policy of granting employees time off to vote in Federal, State, local, Tribal, and territorial elections. Such recommendations should include efforts to ensure Federal employees have opportunities to participate in early voting.

(b) Coordinate with the heads of executive agencies, as defined in 5 U.S.C. 105, to provide recommendations to the President, through the Assistant to the President for Domestic Policy, on strategies to better support Federal employees who wish to volunteer to serve as non-partisan poll workers or non-partisan observers, particularly during early or extended voting periods.

**Sec. 7**. *Ensuring Equal Access for Voters with Disabilities*. Within 270 days of the date of this order, the National Institute of Standards and Technology (NIST) within the Department of Commerce shall evaluate the steps needed to ensure that the online Federal Voter Registration Form is accessible to people with disabilities. During that period, NIST, in consultation with the Department of Justice, the Election Assistance Commission, and other agencies, as appropriate, shall also analyze barriers to private and independent voting for people with disabilities, including access to voter registration, voting technology, voting by mail, polling locations, and poll worker training. By the end of the 270-day period, NIST shall publish recommendations regarding both the Federal Voter Registration Form and the other barriers it has identified.

**Sec. 8**. *Ensuring Access to Voting for Active Duty Military and Overseas Citizens*. (a) Within 200 days of the date of this order, the Secretary of Defense shall establish procedures, consistent with applicable law, to affirmatively offer, on an annual basis, each member of the Armed Forces on active duty the opportunity to register to vote in Federal elections, update voter registration information, or request an absentee ballot.

(b) Within 200 days of the date of this order, the Secretary of Defense shall evaluate the feasibility of implementing an online system to facilitate the services described in subsection (a) of this section.

(c) The Secretary of Defense, in coordination with the Department of State, the Military Postal Service Agency, and the United States Postal Service, shall take all practical steps to establish procedures to enable a comprehensive end-to-end ballot tracking system for all absentee ballots cast by military and other eligible overseas voters under the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301 *et seq.* Within 200 days of the date of this order, the Secretary of Defense shall submit a report to the Assistant to the President for Domestic Policy with a strategic plan for establishing the aforementioned tracking system.

(d) The head of each agency with overseas employees shall designate an employee to be responsible for coordinating with the Federal Voting Assistance Program, including to promote voter registration and voting services available to the agency's overseas employees. The Director of the Office of Management and Budget may issue guidance to assist agencies in making such designations.

**Sec. 9**. *Ensuring Access to Voter Registration for Eligible Individuals in Federal Custody*. (a) The Attorney General shall establish procedures, consistent with applicable law, to provide educational materials related to voter registration and voting and, to the extent practicable, to facilitate voter registration, for all eligible individuals in the custody of the Federal Bureau of Prisons. Such educational materials shall be incorporated into the reentry planning procedures required under section 4042(a)(7) of title 18, United States Code. The educational materials should also notify individuals leaving Federal custody of the restrictions, if any, on their ability to vote under the laws of the State where the individual resides and, if any such restrictions exist, the point at which the individual's rights will be restored under applicable State law.

(b) The Attorney General shall establish procedures, consistent with applicable law, to ensure the United States Marshals Service includes language in intergovernmental agreements and jail contracts to require the jails to provide educational materials related to voter registration and voting, and to facilitate voting by mail, to the extent practicable and appropriate.

(c) The Attorney General shall establish procedures, consistent with applicable law, for coordinating with the Probation and Pretrial Services Office of the Administrative Office of the United States Courts to provide educational materials related to voter registration and voting to all eligible individuals under the supervision of the Probation and Pretrial Services Office, and to facilitate voter registration and voting by such individuals.

(d) The Attorney General shall take appropriate steps, consistent with applicable law, to support formerly incarcerated individuals in obtaining a means of identification that satisfies State voter identification laws, including as required by 18 U.S.C. 4042(a)(6)(B).

**Sec. 10**. *Establishing a Native American Voting Rights Steering Group*. (a) There is hereby established an Interagency Steering Group on Native American Voting Rights (Steering Group) coordinated by the Domestic Policy Council.

(b) The Steering Group shall be chaired by the Assistant to the President for Domestic Policy and shall include the Attorney General, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Labor, the Secretary of Health and Human Services, and the Secretary of Veterans Affairs or their designees. The Chair may invite the participation of the heads or senior representatives of other agencies, as the Chair determines to be helpful to complete the work of the Steering Group. The Steering Group shall consult with agencies not represented on the Steering Group to facilitate the sharing of information and best practices, as appropriate and consistent with applicable law.

(c) The Steering Group shall engage in meaningful and robust consultation with Tribal Nations and Native leaders to inform the Steering Group regarding concerns and potential areas of focus for the report described in subsection (d) of this section, and to assist the Steering Group in developing that report.

(d) The Steering Group shall study best practices for protecting voting rights of Native Americans and shall produce a report within 1 year of the date of this order outlining recommendations for providing such protection, consistent with applicable law, including recommendations for:

(i) increasing voter outreach, education, registration, and turnout in Native American communities; increasing voting access for Native American communities (including increasing accessibility for voters with disabilities);

and mitigating internet accessibility issues that may hinder voter registration and ballot access in Native American communities;

(ii) increasing language access and assistance for Native American voters, including evaluating existing best practices;

(iii) mitigating barriers to voting for Native Americans by analyzing and providing guidance on how to facilitate the use of Tribal government identification cards as valid voter identification in Federal, State, local, Tribal, and territorial elections;

(iv) facilitating collaboration among local election officials, Native American communities, and Tribal election offices; and

(v) addressing other areas identified during the consultation process.

(e) The Department of the Interior shall provide administrative support for the Steering Group to the extent permitted by law.

**Sec. 11**. *Definition*. Except as otherwise defined in section 6 of this order, ''agency'' means any authority of the United States that is an ''agency'' under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5).

**Sec. 12**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 7, 2021.*

[FR Doc. 2021–05087
Filed 3–9–21; 8:45 am]
Billing code 3295–F1–P

**Add. 5**