ORAL ARGUMENT NOT SCHEDULED
No. 23-5173

# In the United States Court of Appeals
# for the District of Columbia Circuit

_____

America First Legal Foundation,
*Plaintiff-Appellant,*
v.

United States Department of Agriculture, et al.,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the District of Columbia, Case No. 22-cv-3029
The Hon. Beryl A. Howell, U.S. District Court Judge
_____

## REPLY BRIEF OF PLAINTIFF-APPELLANT
## AMERICA FIRST LEGAL FOUNDATION
_____

Reed D. Rubinstein (D.C. Bar No. 400153)
Daniel Epstein (D.C. Bar No. 1009132)
James K. Rogers (AZ Bar No. 027287)
Michael Ding (D.C. Bar No. 1027252)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, D.C. 20003
(202) 964-3721
Reed.Rubinstein@aflegal.org
Daniel.Epstein@aflegal.org
James.Rogers@aflegal.org
Michael.Ding@aflegal.org

*Counsel for Plaintiff-Appellant America First Legal Foundation*

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................i

TABLE OF AUTHORITIES...............................................................ii

GLOSSARY OF ABBREVIATIONS .....................................................iv

STATUTES AND REGULATIONS ......................................................v

SUMMARY OF ARGUMENT ..................................................................1

ARGUMENT ...........................................................................................3

  I.  The agencies' obvious goal is to foreclose segregability review of final agency plans and actions. ...............................................................3

  II.  The agencies over broadly interpret the presidential communications privilege.........................................................................7

    A.  The agencies cannot seriously argue that their plans inform direct decisionmaking by the President.................................................8

    B.  Mere "White House oversight" does not trigger the protections of the presidential communications privilege....................................13

  III.  The agencies brush away the text of the Executive Order.......15

CONCLUSION ......................................................................................21

CERTIFICATE OF COMPLIANCE ......................................................22

CERTIFICATE OF SERVICE...............................................................23

## TABLE OF AUTHORITIES

### Cases

*Auer v. Robbins,*
  519 U.S. 452 (1997)................................................................16

*Bassidji v. Goe,*
  413 F.3d 928 (9th Cir. 2005)...........................................15, 18

*Elec. Frontier Found. v. U.S. Dep't of Just.,*
  739 F.3d 1 (D.C. Cir. 2014).....................................................6

*Found. for Gov't Accountability v. U.S. Dep't of Just.,*
  No. 2:22-CV-252-JLB-KCD, 2023 WL 5510417
  (M.D. Fla. Aug. 25, 2023)........................................................7

*In re Sealed Case,*
  121 F.3d 729 (D.C. Cir. 1997)................................3, 4, 5, 7, 9, 10, 12, 15

*Jud. Watch, Inc. v. United States Dep't of State,*
  681 F. App'x 2 (D.C. Cir. 2017) ............................................19

*Judicial Watch, Inc. v. Department of Justice (Judicial Watch I),*
  365 F.3d 1108 (D.C. Cir. 2004).........................................7, 10

*Judicial Watch, Inc. v. U.S. Dep't of Def. (Judicial Watch II),*
  913 F.3d 1106 (D.C. Cir. 2019).....................................4, 8, 11

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019).............................................................16

*Knight First Amendment Inst. V. CIA,*
  11 F.4th 810 (D.C. Cir. 2021) ................................................18

*Loving v. Department of Def.,*
  550 F.3d 32 (D.C. Cir. 2008)....................................4, 7, 10, 11

*National Sec. Archive v. CIA,*
  752 F.3d 460 (D.C. Cir. 2014) ...............................................5

*Protect Democracy Project, Inc. v. Nat'l Sec. Agency*,
    10 F.4th 879 (D.C. Cir. 2021) ................................................. 1, 4, 5, 7, 8

*U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*,
    489 U.S. 749 (1989) ........................................................................ 3, 20

*U.S. Dep't of State v. Ray*,
    502 U.S. 164 (1991) ........................................................................ 3, 20

*United States v. Hassanzadeh*,
    271 F.3d 574 (4th Cir. 2001) ................................................................ 15

*United States v. Nixon*,
    418 U.S. 683 (1974) ............................................................................ 7, 8

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) .............................................................. 18

## Statutes

10 U.S.C. § 871(a) ..................................................................................... 11

## Other Authorities

Executive Order No. 14,019, *Promoting Access to Voting*,
    86 Fed. Reg. 13623 (Mar. 10, 2021) ....................... 1, 2, 6, 13, 16, 17, 19

FACT SHEET: Biden Administration Promotes Voter Participation
    with New Agency Steps, White House (Sept. 28, 2021),
    https://tinyurl.com/2zejsch9 .................................................................. 4

FACT SHEET: The Biden-Harris Administration is Taking Action to
    Restore and Strengthen American Democracy, White House (Dec. 8,
    2021), https://tinyurl.com/mrxt2wwv ...................................................... 4

## Constitutional Provisions

U.S. CONST. art. 2, § 2 .............................................................................. 11

# GLOSSARY OF ABBREVIATIONS

"AFL" means America First Legal Foundation

"FOIA" means the Freedom of Information Act, 5 U.S.C. § 552 et seq.

"JA" means Joint Appendix

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Addendum to the Plaintiff-Appellant's principal Brief.

## SUMMARY OF ARGUMENT

The question here is whether a White House Special Counsel may retroactively assert the presidential communications privilege to block the disclosure of agency records describing proposed and final agency actions under FOIA.

Prior to litigation, all the evidence confirmed that the agencies created agency plans describing their proposed and final agency actions for promoting access to voting to implement a directive from Executive Order No. 14,019, *Promoting Access to Voting*, 86 Fed. Reg. 13623 (Mar. 10, 2021). Because the deliberative process privilege exempts only the pre-decisional and deliberative portions of the records from disclosure, however, the agencies now attempt to withhold the records in full and avoid segregability review by seeking the broader protections afforded under the presidential communications privilege. *See Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 885, 888 (D.C. Cir. 2021).

During litigation, the agencies obtained a post-hoc declaration from Special Counsel Sauber stating that the agency plans were "solicited by the White House … to assist … in formulating advice to the President on voting matters." ECF No. 12-2, JA 124 (Sauber Decl.). Even so, they put

forth an overly broad interpretation of the scope of the presidential communications privilege. The operative text, section 3 of Executive Order 14,019, did not contain a Presidential demand for recommendations or advice. Notably, this is precisely what section 6 of the same Order requested. Special Counsel Sauber's declaration effectively claims that section 3 is ambiguous. Thus, as the District Court noted, the White House seeks deference to its post-hoc interpretation of section 3.

Notwithstanding the President's cramped deference doctrine, the agencies' argument fails on the merits. The relevant records were never directly communicated to the President, nor were they concerned with direct presidential decisionmaking. The agencies instead offer the unprecedented argument that mere "White House oversight" sufficiently triggers the privilege. Ds. Br. at 20.

Section 3's plain text should control. The agencies suggest that the requested information can be separately requested and disclosed through the release of other agency records. But public requesters, including AFL, should be able to rely on the clear text of an executive order to tailor their FOIA requests. If the District Court's decision were to stand, then

agencies could obtain a post-hoc litigation declaration to frustrate otherwise reasonable FOIA requests. This would tear a gaping hole in FOIA's statutory scheme.

Despite FOIA's "strong presumption in favor of disclosure," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), and its purpose to let citizens "know what their government is up to," *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989), the District Court erroneously deferred to Special Counsel Sauber's declaration to hold that the presidential communications privilege applied. *See* ECF No. 35 at 13–14, JA 314–15. This Court should find that the agencies failed to sustain their burden under summary judgment, reverse the decision below, and remand the case for adjudication consistent with its holding.

## ARGUMENT

### I. The agencies' obvious goal is to foreclose segregability review of final agency plans and actions.

Rather than to "ensur[e] that the confidentiality of the President's decisionmaking process is adequately protected," *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) — the sole purpose of the presidential communications privilege — the agencies purposefully raised this broader privilege in litigation to circumvent the segregability review

3

required under the deliberative process privilege. Ds. Br. at 23–24 (citing *Protect Democracy Project*, 10 F.4th at 885–86; *Judicial Watch, Inc. v. U.S. Dep't of Def.* (*Judicial Watch II*), 913 F.3d 1106, 1113 (D.C. Cir. 2019); *Loving v. Department of Def.*, 550 F.3d 32, 37–38 (D.C. Cir. 2008); *In re Sealed Case*, 121 F.3d at 744–45) ; *see also* ECF No. 35 at 18, JA 319.

The agencies concede that "[s]ome of the proposals in agency submissions were eventually implemented in some form, and a smaller subset were already underway." Ds. Br. at 22. In fact, after the agencies completed their agency plans in September 2021, the White House published fact sheets highlighting the "New Agency Steps" to "Promote[] Voter Participation" and the "many other things" that "Federal agencies continue[d to do] to robustly implement President Biden's Executive Order on Promoting Access to Voting." ECF No. 1 ¶ 3, JA 12 (citing FACT SHEET: Biden Administration Promotes Voter Participation with New Agency Steps, White House (Sept. 28, 2021), https://tinyurl.com/2zejsch9; FACT SHEET: The Biden-Harris Administration is Taking Action to Restore and Strengthen American Democracy, White House (Dec. 8, 2021), https://tinyurl.com/mrxt2wwv); *see also* Pl. Br. at 26–28 (listing

4

"key early actions" published in a fact sheet). Such actions described in the agency plans would be disclosed after a segregability review of the records required under the deliberative process privilege.

The agencies stress that, "for a number of agencies, 'the majority of the proposed actions' described in the strategic plans 'have not been implemented whatsoever.'" Ds. Br. at 21 (citing agency declarations). "[R]elease of drafts that never result in final agency action would discourage innovative and candid internal proposals by agency officials," *id.* at 22 (citing *National Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014), but that is analysis relevant to the deliberative process privilege. Because the "presidential communications privilege covers documents in their entirety, including post-decisional and factual material within a record," Ds. Br. at 3 (citing *Protect Democracy Project*, 10 F.4th at 885–86, in turn quoting *In re Sealed Case*, 121 F.3d at 745) (internal quotations omitted), the agencies' emphasis that the agency plans also described proposed agency actions *should* be irrelevant.

The agencies must also contend that even forward-looking aspects of their plans "concerned actions for which the agencies had … *completed* their own … internal review." Ds. Br. at 29 (emphasis added). Section 3

of the Executive Order directed "each agency [to] evaluate ways in which the agency can, as appropriate and consistent with applicable law, promote voter registration and voter participation [and] outlin[e] the ways identified under this review that the agency can promote voter registration and voter participation." 86 Fed. Reg. 13623–24.

Agency determinations of their own authority are final agency actions appropriate for public disclosure without exemption. Here, the agencies met the call of the Order and completed their evaluation of their own legal authorities. These evaluations must be disclosed. *See Elec. Frontier Found. v. U.S. Dep't of Just.*, 739 F.3d 1, 7 (D.C. Cir. 2014) ("an agency is not permitted to develop a 'body of "secret law" … hidden behind a veil of privilege because it is not designated as "formal," "binding," or "final."'" (internal citations omitted)). Repeated disclaimers that agency actions listed in the agency plans are nonbinding do not undo an agency's completed evaluation of its own legal authorities. *But cf.* Ds. Br. at 6, 21, 27, 30. The completed evaluations described in the agency plans would also be disclosed after a segregability review of the records required under the deliberative process privilege.

Despite the agencies' assurance that the District Court's holding does not "permit an agency to withhold any documents, which otherwise must be released, through the mere expedient of sharing those documents with the White House," Ds. Br. at 31, that is exactly what the agencies aim to accomplish here. But for the agencies' convenient, post-hoc declaration from Special Counsel Sauber raising the presidential communications privilege, most—if not all—of the information in the agency plans would be subject to disclosure.

## II.   The agencies over broadly interpret the presidential communications privilege.

All the agencies' cited authorities either concern direct communications with the President or involve "the President's unique constitutional role" — that is, direct presidential decisionmaking. *Found. for Gov't Accountability v. U.S. Dep't of Just.*, No. 2:22-CV-252-JLB-KCD, 2023 WL 5510417, at \*16 (M.D. Fla. Aug. 25, 2023); *see* Ds. Br. at 2–3, 11, 13–14, 16–20, 23, 27–28, 31 (citing *Protect Democracy Project, Inc.*, 10 F.4th at 885–86; *United States v. Nixon*, 418 U.S. 683, 708, 711 (1974); *In re Sealed Case*, 121 F.3d at 744–50, 752; *Loving*, 550 F.3d at 37–38 (D.C. Cir. 2008) ; *Judicial Watch, Inc. v. Department of Justice* (*Judicial Watch I*), 365 F.3d 1108, 1113–15 (D.C. Cir. 2004); *Judicial Watch II*, 913

F.3d at 1113). These authorities are inapposite in this case because the agency plans were neither directly communicated to the President nor did they inform the President's direct decisionmaking.

### A.   The agencies cannot seriously argue that their plans inform direct decisionmaking by the President.

While "courts have traditionally shown the utmost deference to Presidential responsibilities" in the "areas of [Article II] duties" such as "military, diplomatic, or sensitive national security secrets," the *Nixon* court upheld "the expectation of a President to the confidentiality of *his* conversations and correspondence" for records relating to President Nixon's "conversations with aides and advisers." 418 U.S. at 686, 706, 708, 710 (emphasis added). Likewise, the record at issue in *Protect Democracy Project* was a memorandum that the National Security Agency Deputy Director wrote memorializing a phone call he participated in between the President and the National Security Agency Director. 10 F.4th at 882 (D.C. Cir. 2021) .

For records outside of direct communications with the President, *In re Sealed Case* extended the privilege to communications "received in response to a solicitation by members of a presidential adviser's staff," but the court cautioned that "the presidential communications privilege

should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected," and it "should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President." 121 F.3d at 752 (D.C. Cir. 1997).[1] Because "the documents in question were generated in the course of advising the President in the exercise of his appointment and removal power, a quintessential and nondelegable Presidential power," the court was assured that, "even if the President were not a party to [those] communications, [those] communications nonetheless [were] intimately connected to his presidential decisionmaking." *Id.* at 752–53.

In denying a claim of presidential communications privilege, *Judicial Watch I* clarified that the "limited extension" espoused in *In re Sealed Case* required that a communication not made directly to the

---

[1] Because the information sought by the White House from the agencies are publicly described in the executive order, this case does not implicate the *In re Sealed Case* court's concern that "[k]nowledge of factual information gathered by presidential advisers can quickly reveal the nature and substance of the issues before the President, since '[i]f you know what information people seek, you can usually determine why they seek it,'" 121 F.3d at 750–51 (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 910 (D.C. Cir. 1993)).

President must be "solicited and received" by the White House to fall under the privilege. 365 F.3d at 1116, 1123 (D.C. Cir. 2004). However, the requirement is merely necessary but not sufficient. *Judicial Watch I* did not undo the rule from *In re Sealed Case* that "[t]he presidential communications privilege should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President." 121 F.3d at 752.

*Loving* upheld the privilege for a memorandum from the Army Judge Advocate General to the Secretary of the Army offering advice and providing a recommendation on whether he should recommend approval of the death penalty to the President, a second memorandum from the Army Secretary to the President forwarding the first memorandum he received from the Judge Advocate General and providing his own recommendation, and a third memorandum from the Defense Secretary to the President concerning the case. 550 F.3d at 36–37 (D.C. Cir. 2008). The *Loving* court found that the presidential communications privilege protected all three memoranda because they were each submitted to the President and implicated direct presidential decisionmaking, *i.e.*, the statutory requirement that all court-martial death sentences "may not be

executed until approved by the President." *Id.* at 35, 40 (citing 10 U.S.C. § 871(a)).

Likewise, the court in *Judicial Watch II* held that records were protected by presidential communications privilege because they concerned a "decision [which] required the exercise of an informed judgment by the President as Commander in Chief, U.S. CONST. art. 2, § 2, on a highly sensitive subject with serious direct and collateral consequences for foreign relations," and "the extraordinary decision confronting the President in considering whether to order a military strike on Osama bin Laden's compound in Pakistan cries out for confidentiality." 913 F.3d at 1111 (D.C. Cir. 2019).

Here, the agencies ask this Court to extend the precedent from those cases, which involved either direct communications with the President or communications intimately connected to his presidential decisionmaking, to agency plans which involve neither. *See* Ds. Br. at 8 ("the strategic plans were reviewed by Ambassador Rice's immediate staff, who compiled information for her use"); *id.* at 7 ("These agency strategic plans solicited and received by the White House generally described potential agency actions for consideration . . . . The strategic

plans thus offered a snapshot at each agency of on-going development of potential actions as of September 2021.") (internal citations and quotations omitted). While the agencies state that "the plans [were used] to formulate advice for the President regarding 'areas where further Executive Branch action might be needed or considered within the scope of the President's executive authority,'" Ds. Br. at 8 (citing Sauber Decl. ¶ 11, JA 125), they cannot seriously argue that "advising the President on voting rights and voting access issues," *id.* (citing Sauber Decl. ¶ 7, JA 124), is comparable to the President's nondelegable appointment and removal power, the President's statutory role in approving court-martial executives, or the President's authority to conduct a military strike. *Cf.* Pl. Br. at 26 ("The Department of Agriculture's Rural Housing Service will encourage the provision of nonpartisan voter information through its borrowers and guaranteed lenders . . . . The Department of Education will prepare a tool kit of resources and strategies for increasing civic engagement . . . ."). Accordingly, the District Court failed to construe the presidential communications privilege "as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *In re Sealed Case*, 121 F.3d at 752.

**B.    Mere "White House oversight" does not trigger the protections of the presidential communications privilege.**

The agencies argue that the presidential communications privilege applies because the agency plans were "created for the sole purpose of informing White House decisionmaking and oversight." Ds. Br. at 14; *see also* Ds. Br. at 20, 26; *contra* 86 Fed. Reg. 13623 ("each agency shall evaluate ways in which the *agency* can . . . ."). The agencies — apparently aware of the doctrinal difficulties involved in their suggestion that the agency plans were used "to formulate advice for the President regarding 'areas where further Executive Branch action might be needed or considered within the scope of the President's executive authority,'" Ds. Br. at 8 (quoting Sauber Decl. ¶ 12, JA 125),[2] — also describe a back-and-forth process in which the White House provides "oversight" to the agencies in their implementation of the Executive Order. *See* Ds. Br. at 14, 20, 26. Yet, again, this argument betrays the straightforward facts

---

[2] There is no dispute that the "advice to the President and … briefing materials for him," built on "compiled information from the agency strategic plans," Sauber Decl. ¶ 12, Apx.__, are presumptively privileged, but that is not what this case is about.

leading up to agency decisionmaking with a post-hoc attempt to justify opacity.

First, the Executive Order directed the agencies to submit a plan with certain parameters to implement a specific policy, Ds. Br. at 4. Next, "the White House furnished agencies with a template to assist them in preparing their strategic plans," Ds. Br. at 6. Then "the President's advisers … used the strategic plans to provide feedback and guidance to agencies" regarding "the agencies' potential plans for implementation" of the executive order, Ds. Br. at 8, "facilitating White House oversight and guidance to agencies concerning implementation of the President's policy priorities." Ds. Br. at 20.

While Special Counsel Sauber's declaration states that the agency plans were "solicited and received by the White House," Sauber Decl. ¶ 8, JA 124, it appears that the intent for their submission to the White House was more for White House "oversight" over the agencies' implementation of the Executive Order rather than to inform direct presidential decisionmaking. The presidential communications privilege is "rooted in the need for confidentiality to ensure that presidential decisionmaking is of the highest caliber," *In re Sealed Case*, 121 F.3d at

750, not in a need for confidentiality to ensure that agency decisionmaking is of the highest caliber. Presidential supervision of agency action does not convert disclosable agency records into withheld presidential communications.

The agency plans are multiple degrees of separation away from the President, and they describe agency actions and proposed agency actions that the *agencies* themselves concluded are within their statutory authority. If the District Court's decision were to stand, mere White House "oversight" of an agency's implementation of an administration's policy would bring matters not involving direct decisionmaking under the cloak of the presidential communications privilege.

## III.  The agencies brush away the text of the Executive Order.

The agencies fail to provide a persuasive reading of the Executive Order that supports their contention that the agency plans were "created for the sole purpose of informing White House decisionmaking and oversight." Ds. Br. at 14. "As is true of interpretation of statutes, the interpretation of an Executive Order begins with its text." *Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005) (citing *United States v. Hassanzadeh*, 271 F.3d 574, 580 (4th Cir. 2001)). As AFL argued in its principal brief,

15

"[t]he plain text of the executive order demonstrates that the strategic plans called for in section 3(b) were not intended for presidential decisionmaking and deliberations." Pl. Br. at 12–17. And even if the Executive Order was ambiguous, Special Counsel Sauber's declaration does not warrant *Auer* or *Kisor* deference. *Id*. at 18–21 (citing *Auer v. Robbins*, 519 U.S. 452 (1997); *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)). Section 3 was not a Presidential call for recommendations or advice. By contrast, section 6 of the Order did make such a request.

Special Counsel Sauber's declaration impliedly claims that section 3 is ambiguous. In effect, and as noted by the District Court, the White House seeks deference to a post-hoc interpretation of the Executive Order. The agencies brush these points aside. Instead, they assert that *Auer/Kisor* deference is not the question under FOIA and "[n]o legal interpretation of EO 14019 is required." Ds. Br. at 25–26.

Even so, the agencies attempt to reconcile the text of section 3 of the Order with Special Counsel Sauber's declaration by stating that AFL's reading "disclaim[s] any further presidential oversight or policy direction," and the "President instead directed agencies to brainstorm and identify ways that they *can* promote voter registration and voter

16

participation with future possible actions, not merely to report on actions already taken." *Id.* at 26. (internal quotations and citations omitted) (emphasis in original). But mere "presidential oversight or policy direction" does not trigger the protections of the presidential communications privilege. Part II, B, *supra*.

The agencies' "more apposite comparison" of section 3 to section 7 also fails to explain why AFL's "negative inference is unavailing" or "artificially narrow." Ds. Br. at 26–27. Section 7, the agencies argue, directed the National Institute of Standards of Technology to "publish recommendations," in contrast to section 3's "solicit[ation of] confidential plans for White House consideration, not for publication." *Id* at 27. But all that reveals is that the National Institute of Standards and Technology was directed to publish its recommendations, while the agencies were not directed to publish their agency plans. It does not follow that the agencies were directed to provide recommendations to the President under section 3. *But cf.* 86 Fed. Reg. at 13625 ("Sec. 6 . . . . provide recommendations to the President").

Notwithstanding the agencies' argument that "the presidential communications privilege would equally have applied had the President

17

conveyed his request for advice by nonpublic memorandum or conversation rather than by publicly announced order," Ds. Br. at 25, the text of the Executive Order matters. *Bassidji*, 413 F.3d at 934. By stating that "[n]o legal interpretation of EO 14019 is required," and "the government may satisfy its 'burden to justify nondisclosure' by 'submitting declarations attesting to the basis for the agency's decision' to withhold the record at issue," Ds. Br. at 24–25, the agencies effectively argue that Special Counsel Sauber's declaration supersedes any contrary evidence from the text of the Order. *But cf. Knight First Amendment Inst. V. CIA*, 11 F.4th 810, 818 (D.C. Cir. 2021) (summary judgment warranted when declarations justify nondisclosure and are "not controverted by either contrary evidence in the record") (internal quotation and citations omitted); *Washington v. Trump*, 847 F.3d 1151, 1165 (9th Cir. 2017) ("The Government has offered no authority establishing that the White House counsel is empowered to … supersed[e] the Executive Order signed by the President.").

Members of the public, including AFL, should be able to rely on the clear text of the Executive Order to narrowly tailor their requests for records under FOIA. Despite the agencies' suggestion that AFL "could

have requested a range of agency records instead of directing its requests solely at the particular [agency plans]," Ds. Br. at 32, "an agency need not respond to overly broad and unreasonably burdensome requests." *Jud. Watch, Inc. v. United States Dep't of State*, 681 F. App'x 2, 4 (D.C. Cir. 2017) (internal citations omitted). Here, AFL narrowly tailored its requests to the one record from each agency that would—according to section 3 of the Executive Order—contain all the pertinent information in one place. Furthermore, if a mere post-hoc declaration can supersede the plain meaning of the Executive Order showing that the records at issue were not created for the purpose of direct presidential decisionmaking, then nothing could prevent an agency from frustrating a request for other related records by also obtaining a post-hoc declaration stating that those records were also solicited and received by the White House to inform direct presidential decisionmaking. What the agencies' interpretive theory permits is the ability of a President to peer into any agency decision and determine that his political equities justify the conversion of that decision to a presidential communication.

The agencies fail to overcome the inconsistencies between the text of the Executive Order and Special Counsel Sauber's declaration, they

disregard the legal standard for resolving that contradiction, and they offer a doubtful alternative to AFL's request to assure the Court that, while the records at issue are protected under the presidential communications privilege, they have no desire to "conceal [the underlying information about] agency actions from public view." Ds. Br. at 32 (quoting Pl. Br. at 29).[3]

Despite FOIA's "strong presumption in favor of disclosure," *Ray*, 502 U.S. at 173 (1991), and its purpose to let citizens "know what their government is up to," *Reps. Comm. For Freedom of Press*, 489 U.S. at 773 (1989), the District Court erroneously deferred to Special Counsel Sauber's declaration to hold that the presidential communications privilege applied. *See* ECF No. 35 at 13–14, JA 313–14.

---

[3] *See* ECF No. 1 ¶¶ 5–10, JA 12–14 (listing congressional requests for information that the agencies have reportedly obstructed); *see also Hearing: Growth of the Tax-Exempt Sector and the Impact on the American Political Landscape Before the Subcomm. on Oversight of the H. Comm. on Ways and Means*, 118th Cong. at 2–3 (2023) (statement of Stewart Whitson, Legal Dir., Found. for Gov't Accountability) (available at https://tinyurl.com/mtwwybbx) ("the Biden administration refuses to disclose the list or even the criteria for approval, not only to FGA, but to the dozens of members of Congress who have demanded answers as well.").

## CONCLUSION

The order below should be reversed and this case remanded for adjudication consistent with this Court's ruling.

Dated:     March 29, 2024

<div style="margin-left: 40%;">

*/s/ Michael Ding*
Reed D. Rubinstein (D.C. Bar No. 400153)
Daniel Epstein (D.C. Bar No. 1009132)
James K. Rogers (AZ Bar No. 027287)
Michael Ding (D.C. Bar No. 1027252)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, D.C. 20003
(202) 964-3721
Reed.Rubinstein@aflegal.org
Daniel.Epstein@aflegal.org
James.Rogers@aflegal.org
Michael.Ding@aflegal.org
*Counsel for America First Legal Foundation*

</div>

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), the undersigned counsel certifies compliance with the requirements of Fed. R. App. P. 32. The brief is 4,057 words in length and follows the required font and formatting regulations.

*/s/ Michael Ding*
Michael Ding
*Counsel for America First Legal Foundation*

## CERTIFICATE OF SERVICE

I, Michael Ding, certify that on March 29, 2024, I caused the foregoing document to be filed with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Michael Ding*
Michael Ding
*Counsel for America First Legal Foundation*