# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 5, 2024          Decided January 24, 2025

No. 23-5173

AMERICA FIRST LEGAL FOUNDATION,
APPELLANT

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-03029)

———

*Daniel Epstein* argued the cause for appellant.  With him on the briefs were *Reed D. Rubinstein* and *Michael Ding*.

*Jay Alan Sekulow*, *Jordan Sekulow*, *Andrew J. Ekonomou*, *Benjamin P. Sisney*, and *Nathan Moelker* were on the brief for *amicus curiae* the American Center for Law and Justice in support of appellant.

*Jeremiah L. Morgan* and *William J. Olson* were on the brief for *amicus curiae* Citizens United in support of appellant.

*Jeffrey E. Sandberg*, Attorney, U.S. Department of Justice, argued the cause for appellees.  With him on the brief were

2

*Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Mark B. Stern*, Attorney.

Before: PILLARD and GARCIA, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

GARCIA, *Circuit Judge*:  The district court held that strategic plans submitted by federal agencies to the White House are protected by the presidential communications privilege and therefore exempt from Freedom of Information Act disclosure.  We agree.

**I**

On March 7, 2021, shortly after President Biden took office, he issued Executive Order 14019, *Promoting Access to Voting*, 86 Fed. Reg. 13623 (Mar. 7, 2021).  The Order states that "[i]t is the policy of my Administration to promote and defend the right to vote for all Americans who are legally entitled to participate in elections."  *Id.* at 13623.  Section 3 of the Order instructs agencies to "consider ways to expand citizens' opportunities to register to vote and to obtain information about, and participate in, the electoral process."  *Id.*  It then directs the "head of each agency" to "evaluate ways in which the agency can, as appropriate and consistent with applicable law, promote voter registration and voter participation."  *Id.*  The key provision at issue here, Section 3(b), then requires each agency to submit to the Assistant to the President for Domestic Policy a "strategic plan outlining the ways identified under this review that the agency can promote voter registration and voter participation."  *Id.* at 13624.  The plans were due within 200 days of the date of the Order.  *Id.*

3

After that deadline, America First Legal Foundation (AFL) submitted Freedom of Information Act (FOIA) requests for the strategic plans of fourteen different agencies.[1] FOIA requires federal agencies to make their records available to the public, subject to nine exemptions for specific categories of material. 5 U.S.C. § 552(a)–(b).

When the agencies did not respond favorably to those requests, AFL initiated this suit to compel disclosure of the documents. The agencies moved for summary judgment, arguing that the plans were protected by FOIA Exemption 5, which applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." *Id.* § 552(b)(5). Exemption 5 is understood as "incorporat[ing] the privileges which the government enjoys under the relevant statutory and case law in the pretrial discovery context." *DOJ v. Julian*, 486 U.S. 1, 11 (1988) (alteration in original) (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)). The agencies invoked the presidential communications privilege, which is one of the privileges Exemption 5 incorporates. *See Loving v. DOD*, 550 F.3d 32, 37 (D.C. Cir. 2008). Among other supporting materials, the agencies submitted a declaration from Richard Sauber, Special Counsel to the President, as well as declarations from representatives of each defendant agency. The district court

---

[1] Those agencies are the Department of Agriculture, Department of Education, Department of Energy, Environmental Protection Agency, Department of Health and Human Services, Department of Homeland Security, Department of Housing and Urban Development, Department of the Interior, Department of Labor, Small Business Administration, Department of State, Department of Transportation, Department of the Treasury, and Department of Veterans Affairs.

4

granted the agencies' summary judgment motion. *Am. First Legal Found. v. USDA*, No. 22-cv-3029, 2023 WL 4581313 (D.D.C. July 18, 2023).  AFL timely appealed.

## II

We review the district court's grant of summary judgment *de novo*. *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994). "In the FOIA context this requires that we ascertain whether the agency has sustained its burden of demonstrating that the documents requested are . . . exempt from disclosure under the FOIA." *Id.*  The agencies may "carry that burden by submitting declarations 'attesting to the basis for the agency's decision.'" *Citizens for Resp. & Ethics in Wash. v. DOJ*, 58 F.4th 1255, 1262 (D.C. Cir. 2023) (quoting *Campbell v. DOJ*, 164 F.3d 20, 30 (D.C. Cir. 1998)).  Summary judgment that a FOIA exemption applies "is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Id.* (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

## A

The presidential communications privilege protects documents "that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997).  The privilege reflects the idea that the "President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974).  The

5

Supreme Court has explained that the privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Id.*

Because the President necessarily relies on others to fulfill his constitutional role, we have held that the privilege must extend to documents "solicited and received" not just by the President, but also by "immediate White House advisers with broad and significant responsibility for investigating and formulating the advice to be given the President." *Loving*, 550 F.3d at 37 (cleaned up) (quoting *Jud. Watch, Inc. v. DOJ*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (*Judicial Watch I*)); *see In re Sealed Case*, 121 F.3d at 750–52. Thus, any material that an agency submitted to the Office of the President may retain its privileged status even if it "traveled up the chain of command before the President received it." *Loving*, 550 F.3d at 40; *see Judicial Watch I*, 365 F.3d at 1117. Further, where the privilege is properly invoked, it "applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones." *In re Sealed Case*, 121 F.3d at 745.

**B**

To justify invoking the presidential communications privilege here, each of the defendant agencies referred to the declaration of Richard Sauber, Special Counsel to the President. Sauber's declaration explains that the White House solicited the strategic plans "to inform future policy developments on voting access and to assist [the Domestic Policy Council] in formulating advice to the President on voting matters." J.A. 124 ¶ 7. After the plans were submitted to the White House, the head of the Domestic Policy Council (Ambassador Susan Rice) and her staff compiled information from the plans "for Ambassador Rice's use in White House policy formulation and in briefing the President." J.A. 125

6

¶ 12.  "This advice, in turn, informed the President on the extent of agency actions and proposals on relevant voting matters and on areas where further Executive Branch action might be needed or considered within the scope of the President's executive authority."  *Id.*  The White House also engaged in "further discussions with the Defendant agencies regarding the content of their plans" and "the agencies' potential plans for implementation."  *Id.* ¶ 11.  Sauber attested as of January 2023 that "some of these discussions remain ongoing."  *Id.*

In short, Sauber explained that the plans were created and submitted to the Office of the President at the President's request and then used to inform confidential deliberations and decisionmaking by the President and his close advisors.  If credited, that explanation would support the agencies' invocation of the presidential communications privilege under our precedent.  *See, e.g.*, *Loving*, 550 F.3d at 37, 40.

## C

The primary issue on appeal is a narrow and fact-specific one.  AFL does not dispute that the presidential communications privilege would apply to the strategic plans if the Sauber declaration's statements about the nature and use of the documents are accurate.[2]  Instead, AFL contends that the

_____

[2] This case does not present broader questions about the scope of the presidential communications privilege.  AFL argued in its reply brief that the privilege protects only deliberations pertaining to the President's "quintessential and nondelegable" powers, and that the voting-related actions here do not fit that bill.  Reply Brief 9 (quoting *In re Sealed Case*, 121 F.3d at 752).  AFL forfeited this argument by failing to raise it in the opening brief, and we decline to address it.  *See Abdullah v. Obama*, 753 F.3d 193, 199 (D.C. Cir. 2014).

7

declaration contradicts other evidence in the record. *See Larson*, 565 F.3d at 862. In particular, AFL argues that the remainder of the record proves the strategic plans were not inputs into presidential deliberations and decisionmaking, but instead documented "actions to be taken by each agency, independent of any decisionmaking or deliberation by the President." Appellant's Brief 13. AFL's primary contention is that the text of the Executive Order supports its view. AFL also posits that the individual agency declarations and an informational fact sheet on the Order published by the White House support its position. We disagree. The Sauber declaration and the agencies' position are entirely consistent with the remainder of the record.

Start with the Executive Order. Section 3 of the Order required all agencies to "consider" and "evaluate" ways to enhance voter registration and participation. 86 Fed. Reg. at 13623. It then ordered each agency to submit to a close presidential advisor a "strategic plan outlining the ways identified under this review that the agency can promote voter registration and voter participation." *Id.* at 13624. This language is naturally read as instructing agencies to think through and describe for the White House the steps they could take to further the President's stated policy goals, so that the President and his advisors could consider next steps. That understanding also fits the context in which the Order was issued. It is perfectly sensible for an incoming President, shortly after his inauguration, to instruct all federal agencies to consider ways they could further a "policy of [the new] Administration" and report back. *Id.* at 13623. Such reports are natural inputs into further presidential deliberation and policymaking, just as the Sauber declaration describes. AFL's position—that the President merely asked for agencies' plans for informational purposes and forswore further deliberation

8

and action in this policy area—is unsupported by the Order's text and is, at best, highly counterintuitive.

In response, AFL emphasizes that other sections of the Executive Order asked certain actors to "provide recommendations to the President," whereas Section 3 does not use the word "recommendation." *See id.* at 13625. Per AFL, if the strategic plans were truly meant to inform presidential deliberations and decisionmaking, the Order would have described them as providing "recommendations" too. That assertion is unconvincing. Calling for "recommendations" is not the only way to ask for submissions that would inform later deliberations. The Executive Order tasked the agencies with exploring all possible strategies at their disposal to promote voter registration and voter participation, and with presenting those ideas to the White House. Listing the universe of possible actions is like offering a menu: It is a list of all options that does not necessarily recommend or endorse any of them. A recommendation, by contrast, is an actual endorsement of a subset of those possibilities. Both can be inputs into later decisionmaking. Either, if used in presidential decisionmaking, can fall within the protection of the presidential communications privilege. The fact that the Order did not describe the strategic plans as providing "recommendations" therefore does not contradict Sauber's declaration.

Other record evidence further supports Sauber's declaration. A template that the White House provided the agencies as a guide stated expressly that "[l]isting an action in this strategic plan does *not* commit your agency to implementing the action." J.A. 124 ¶ 8. That language corroborates that the strategic plans were meant to inform the White House of potential actions, not simply to report on actions the agencies independently decided to take.

9

The agencies' individual declarations reflect the same understanding. For example, the Department of Housing and Urban Development explained that the strategic plan it submitted to the White House "listed proposals that could be implemented," but that the strategic plan "did not summarize what the Department would in fact implement or what had been implemented." J.A. 229 ¶ 20. Similarly, the Department of Transportation declaration states that its strategic plan "include[d] all possible actions the agency could take within the bounds of its existing authorities," but that the agency "was not suggesting implementation of all the possible actions listed in its Plan." J.A. 180 ¶ 5. The declarations from the other defendant agencies contain similar language. *See, e.g.*, J.A. 116–17 ¶¶ 18, 20 (Small Business Administration plan contained "details of potential strategies" to be used in "the ongoing consultative process" between the agency and the White House); J.A. 155 ¶ 14 (Department of Interior plan contained "details of possible strategies as to various means of implementing the Executive Order"); J.A. 253 ¶ 14 (Department of Health and Human Services plan contained "potential actions"); J.A. 263 ¶ 5 (Environmental Protection Agency plan contained "proposed actions").

Further undermining AFL's view that the strategic plans simply reported final agency decisions is the fact that, according to several agencies, many of the actions identified in the strategic plans were not implemented following discussions with the White House. For example, the Department of Interior declaration stated that the strategic plans "contain[ed] recommended strategies that the Department has not implemented, that the White House rejected and the Department did not pursue further, and/or that were determined to not be feasible after further consultation." J.A. 156 ¶ 15. Similarly, the Department of Agriculture declaration explained that "none of the actions proposed have been implemented in

10

the exact manner proposed in the Strategic Plan, and the majority of the proposed actions have not been implemented whatsoever." J.A. 135 ¶ 18. These declarations are entirely compatible with the facts as the government describes them, but are impossible to square with AFL's view.

In response, AFL claims that three agency declarations "admitted that their strategic plans consisted entirely of the completed actions that the agencies had already taken in response to the executive order." Appellant's Brief 22. AFL overstates the case. One declaration explained that the agency's plan "included descriptions of actions [the agency] planned to take with respect to voting access." J.A. 245 ¶ 6. Another stated that its plan "identified three key service areas to promote access to voting and listed responsive actions in each of those categories." J.A. 258 ¶ 9. And the third makes clear that the agency's plan solely "outlin[ed] ways in which [the agency] could help promote voter registration and participation." J.A. 263 ¶ 5. Nowhere in these declarations do the agencies state or imply that the proposed actions in the strategic plans were either final or already implemented. More importantly, the declarations fully comport with Sauber's explanation that the agency's submissions would inform presidential deliberation and decisionmaking.

Finally, AFL argues that the agencies' position is inconsistent with a White House Fact Sheet released on September 28, 2021. That document, published just after the 200-day deadline set by the Executive Order, highlighted "early actions to implement the President's Order" that several agencies had pursued. *Fact Sheet: Biden Administration Promotes Voter Participation with New Agency Steps*, THE WHITE HOUSE (Sept. 28, 2021), https://perma.cc/D3CH-C2EG. But the fact that some agencies had committed to certain policies or had some underway is entirely consistent

11

with Sauber's statement that the White House solicited those plans to inform further presidential deliberation and decisionmaking. And nothing else in the Fact Sheet suggests otherwise. To the contrary, the Fact Sheet noted that more actions would follow in "the weeks and months to come," as part of the "President's efforts to protect the right to vote." *Id.*

In sum, the record on appeal not only is consistent with, but also supports, the Sauber declaration. The strategic plans the agencies submitted were "solicited" by the President, were "received" by his "immediate White House advisers [with] . . . broad and significant responsibility for investigating and formulating the advice to be given the President," and served to inform "presidential decisionmaking and deliberations." *Loving*, 550 F.3d at 37 (cleaned up). Applying the privilege here therefore serves the "need for confidentiality in the communications of [the President's] office" and "protect[s] the effectiveness of the executive decision-making process." *Judicial Watch I*, 365 F.3d at 1115 (citations omitted).

**D**

AFL makes three additional arguments, but none are persuasive.

First, AFL raises the possibility that the agencies are abusing the presidential communications privilege to create a body of "secret law" that conceals agency action and deliberation from the public. Appellant's Brief 7. We are not convinced. We have held that an agency is "not permitted to develop 'a body of secret law, used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as formal, binding, or final.'" *Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 7 (D.C. Cir. 2014) (quoting *Schlefer v. United States*, 702 F.2d 233, 244 (D.C. Cir. 1983)). The concern is that agencies might

12

take steps to withhold "'binding agency opinions and interpretations' that the agency 'actually applies in cases before it.'" *Id.* (quoting *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 708 (D.C. Cir. 1971)). But like other agency records we have previously found not to implicate the doctrine, the strategic plans at issue here "do not constitute or establish 'law' in the sense of setting forth a decision that binds subordinates or a regulated party." *Jud. Watch, Inc. v. DOD*, 913 F.3d 1106, 1113 (D.C. Cir. 2019) (*Judicial Watch II*). Instead, the strategic plans simply "document advice given up the chain to someone (the President) who then made a decision." *Id.* The strategic plans thus reflect the "free flow of ideas" between each agency and the President; they are not "the law itself." *Sterling Drug*, 450 F.2d at 708. That conclusion does not mean that any agency's action or the reasons for it will remain secret: The presidential communications privilege poses no bar to members of the public who submit FOIA requests for records concerning implemented agency actions related to voting access. The distinctive fact about this case is that AFL sought only the specific, confidential agency communications that the President requested and that his Office then used to formulate advice for him.

Second, AFL contends that the district court improperly "deferred" to the Sauber declaration's interpretation of the Executive Order. Appellant's Brief 18. We see no indication that the district court did so. The district court instead used the sworn facts in the Sauber declaration as evidence of how the strategic plans were developed and used in the Office of the President. *Am. First Legal Found.*, 2023 WL 4581313 at *6– 7. There is nothing wrong or unusual about that approach. The government "typically" relies on such affidavits to "prov[e] the applicability of claimed exemptions" in a FOIA case. *ACLU v. DOD*, 628 F.3d 612, 619 (D.C. Cir. 2011). And, as we have explained, the district court properly credited the Sauber

13

declaration because it is not "controverted" by "contrary evidence in the record nor by evidence of agency bad faith." *Larson*, 565 F.3d at 862.

Third, AFL challenges the government's declarations as impermissible "post hoc" rationalizations. Appellant's Brief 18. This position is also baseless. Although the declarations were written in response to the present litigation, they describe the facts necessary to determine whether the privilege applies. As explained, the use of such declarations is commonplace in FOIA litigation, and the declarations are consistent with the record evidence. *See, e.g.*, *Judicial Watch II*, 913 F.3d at 1111–12 (relying on the sworn declaration of an agency FOIA officer stating that the requested documents were used to brief the President and his advisors).

### III

The judgment of the district court is affirmed.

*So ordered.*